Good morning your honor, Kim Coker, I represent Anthony Elsko and Oakland Benta, the appellants in this matter. Right, and Ms. Coker, we thank you for coming down, but before we hear your argument, we need to address Mr. McIntosh and try to get a handle on exactly where we are. Okay. Good morning, your honors. Good morning. Maxwell McIntosh on behalf of Appellee Adelbert Bryan. Okay, Mr. McIntosh, correct me if I'm wrong, but you were ordered to file a brief, I think by December 6th in this case. To my knowledge, the brief has still not been filed. Have you filed the brief yet? No, your honor. In this matter, appellees have made a procedural decision not to proceed with the filing of a brief and would waive arguments in this matter. Are you throwing in the towel completely? No, your honor. That's not the matter that while the court... has very credible and substantial arguments, and you don't contest those arguments, why isn't her appeal uncontested? The appeal is not uncontested, your honor. In this matter, by procedural decision, appellee decided not to go forward with filing of a brief. The court issued an order. There was some problems with the electronic case filing as far as receipt of notice, and so I did not receive the court's first letter of November 22nd until December 1. And then... Did you receive the first letter December 1? Yes. Okay. Which was direct in the brief by December 3rd. At that point, appellee had to make a decision with reference to retaining a separate counsel in order to comply with the court's order. And then... Were you advised of that? Were you a client? Were both of you made that decision? I'm sorry? Were we advised of that? Yes. Before you stir up this now and said that, who did you advise and when did you advise me of that? Patrick McCann from the Third Circuit had been in contact with Undersigned Counsel regarding this matter, and he was advised that appellee was deciding as to... Because of the need to file the brief, then there would be need for separate counsel to go forward in this matter. Subsequently... When did he advise you of that? December 1, Your Honor. Mr. McCann had actually contacted me, and that's how I found out about the court's letter of November 22, with reference to the court's order of December 7, indicating the brief should be filed by December 8. I was not aware of that order until December 13, because also with problems with the electronic case filing system. And when I... What are the problems with the electronic case filing system that kept you from being aware of it? The... My internet access either had rejected the electronic case filing documents, so that I wasn't receiving notice. Your internet access rejected our access? Well, not rejected your access. Your documents were placed in... Either blocked by junk email, and therefore, when the court contacted me is when I went into the PACER system and learned of the court's order. How did you get into the PACER system? Through internet, sir. No problem accessing it? Correct. I can access, but when the matters were sent by email, they were not received by me. Was your email address max... MAC at zss.net? That's correct, sir. And we never... I checked last night. We never got any notice back, so the email that was sent to you was bounced back to us. There was never... As far as the court system is concerned, there was no notice of non-delivery ever received. So you're saying it was not received by you, so it's kind of sitting out there in cyberspace. The ether is a cyberspace. The matter was blocked, and then when I was contacted by the court... The matter was blocked by who? By your provider? Correct, sir. Would that not mean that it wasn't received and it would be kicked back to us? I'm not sure. Some of the matters actually go into a junk email box or spam. Under your email account, was it spam? Okay. Is that what you're saying? Right, but in the VI Access system, some of the spam emails do not go into my junk box as such. It's actually submitted into a separate location. That's how much time we have to figure out what's going on there or where the rest of it is. I'm tempted to get somebody into the VI Access, explain exactly how the email works, and find out whether or not if something was not bounced back to us, that means it would have been delivered to you in terms of the circuit. As far as VI Access, are they in St. Croix? They're on St. Croix, sir. Pardon me? On St. Croix, yes. Okay. Okay. Okay. Okay. Okay.  Okay. But rather than trying to get to what went where, whether it got there, whether or not it was submitted, the only thing that's clear and that you, I think, conceived, correct me if I if you disagree with it, I think you just stated that even though you were ordered to file a brief, you decided not to file a brief. I think you referred to it as some kind of procedural process. You decided not to file a brief and you informed Patrick McClellan of that back on December 1. Is that right? The indication that I gave to Mr. McCann was that the short notice that I received of the matter, it was one in which we had to make a decision as to which council would be able to file a brief in the matter, but that undersigned council may not necessarily be the one proceeding on behalf of Pele in this matter if a brief had to be filed. Martin, you said a few minutes ago was that you had decided for whatever reason, and I was saying it's because of short notice, although you were given the briefing schedule, I'm assuming, at the same time as Scott received her briefing schedule, you decided not to file a brief. If I may, what I indicated was that procedurally, Appellee had decided not to go forward with the filing of a brief, that we would waive arguments. When I received notice on December 1 that the court had indicated that a brief had to be filed by December 3, it was necessary to then bring in or to look for appellate counsel to deal with the matter. Well, one, you could have filed a brief, or you could have asked for an extension of the November of the date we gave you, the December 3 date. The only reason that date was so tight was because you already were way over the date for filing the brief, the date that Ms. Cox was able to two-day time frame. It was done with the assumption that you had done something towards discharging the obligation that already existed to file a brief when you got this briefing schedule. But it is clear that no brief was filed at the time we ordered you to file a brief. You are still counsel of record in this matter, I'm assuming. Your name is here as Counsel for Appellate. Correct, Your Honor. Can you explain to us why we shouldn't impose a fine for you not having filed a brief as ordered in the December 1 notification, other than what you just said, which is more obfuscation than explanation? In the December 1 notification, Your Honor, or December 7 notification? Any notification. We ordered you to file a brief. The brief was never filed, and now you're trying to say that, well, it's because you're trying to decide what a counsel was wanting to file a brief. You're still counsel of record. You never asked to be released or to withdraw from representation, and you never asked for additional time. You simply decided you weren't going to file a brief. So the question to you is, why, help me understand why some kind of sanction is not in order now? Your Honor, in this matter, there was a procedural decision early on with reference to appellee not proceeding. Who decided that? It was a joint decision, Your Honor. Between you and co-counsel, or you and client, your client? Client, Your Honor. And you're saying that procedural decision, as you're calling it, trumps the court's order. So yeah, there's a court sitting out there, but court is ordering something, but we've got a procedural decision here, so we're not going to pay attention to what the court said. The court can go to hell because we've got a procedural decision on our hands. Is that what you're saying, Your Honor? No, Your Honor, and what I'm indicating is that the actual notice of the order was on December 1 for a brief due. That's when I received notice, correct? For a brief due on December 3rd. Correct. And so... A brief that had been due for how many months, Mr. McGann, had the brief been due for when that December 1 notice went out? So April 3rd. So we gave you notice on December 1 to file a brief in two days. It was due April 3rd. It was due half a year before we sent you the notice. Right, but as I indicated to the court, the procedural decision that was made that we were not going to go forward with the filing of a brief... We're not communicating here. You're telling me about we, whoever that mystical we is, you and the ethers, decided you weren't going to go forward with the filing of a brief, even though it was court order, ordering you to do it. Do you understand what an order is? Yes, Your Honor. It's not a suggestion that if counsel feels like doing it and there are no procedural obstacles to doing it, counsel might want to consider doing it if counsel can fit it into his or her schedule. That's not my definition of an order. Order is you will do it by X date, the X date is defined by the order, or else ask us for an additional time, rather than huddling up with the ethers and then deciding we've got this procedural compliance, we're not going to pay attention to the order. Your Honor, and if I may, with reference... You're not helping yourself, Mr. Maxwell. I'm sorry, Your Honor? You're not, Mr. Maxwell, you're not helping yourself here at all. What all you're doing is explaining what I'm still trying to explain why it's, understand why it's dismissed. It seems to me what happened here is that you didn't decide, the order wasn't convenient, you decided you either wouldn't or couldn't comply with it, and you're still giving me smoke, blowing it up, you know what, as to why you weren't going to comply with it. These are the kinds of conversations I used to have with defendants during sentencing, exactly the kind of feedback I used to get when I was a trial counsel, when a trial judge, from defendants, when I was trying to see if there was any kind of remorse or acceptance of responsibility, this is the kind of smoke they would blow up my you know what. And they want to blow some more smoke, or can we get on with Ms. Contra's argument and try to decide what's the best way to resolve this matter? Your Honor, I don't wish to blow any smoke. I accept the responsibility with reference to the matter, but there... Why don't we do this way, Mr. McIntosh, you're hereby fined $500 for not having filed a brief in this matter, or having asked to be relieved of the responsibility for filing an obligation for filing the brief. That has to be paid to the court of the clerk by five o'clock this Friday. For every day, I'm not talking business day here, for every day that that $500 is not paid to the clerk of court, an additional $100 will be assessed. So if it doesn't get paid till Friday, you owe $700. If it doesn't get paid till next Friday, it's another $100 for damages. So it's $500 to be paid to the clerk of the court this Friday by five o'clock. Any questions at all about that? You want to have any discussion with the procedural users that you speak to before you decide matters are returned to the court, before you answer that question? Any question at all about that? Yes, Your Honor. Just to be clear, would it be the clerk of the district court, or the clerk of the third circuit? That's a good question. I assume district court. Circuit court, okay. Will you be here? What's that I get until Friday? Your Honor, I'll pay the $500 today. All right. Your Honor, I accept responsibility. I'll pay the $500 today. Easy as that got. All of a sudden, that got really easy. We could have had this done with 10 minutes ago had we just started from where we ended up with. Thank you, Your Honor. Okay, thank you. Ms. Kotcher? Your Honor, so I would normally reserve rebuttal. I understand. We had this situation yesterday where I suggested that the attorney might want to reserve rebuttal and then argue with the argument that didn't occur, or even go over to opposing counsel's chair, rant and rave about the irrational argument Ms. Kotcher made, and how we have enough confidence in this court to know that we're not going to be misled by the arguments of appellant's counsel. Then you can run over to where you are now and either rest on your brief or say that you're just thoroughly offended by what counsel for appellee has just argued to you. Woody Allen did that in some movie where he cross-examined himself. I can't remember the name of the movie. He sat on the witness chair. Then he got down. He asked himself a question. Then he ran up on the witness chair and he started sweating. But that's, I suggest you don't. In other words, we wish we could hear from Woody Allen from time to time around here, but it's just a reality. It doesn't happen. It would be a pleasant refresher, but I'm not sure you need to reserve rebuttal. Thank you, Your Honor. This is a case where two private security guards at a public ceremony were tapped into action by the governor or the governor's chief of security to control a disturbance and held liable for state action. What is the evidence of the nexus between the two defendants who are left in the state and the state in the territory? I.e. states and states and communities? There is no nexus. In fact, there was a suggestion from the appellate division in their opinion that they considered it a rather weak nexus, wasn't there? Yes. In a footnote, the district court gave its opinion on the lack of evidence supporting the jury's verdict. You did present evidence that they were private actors? That was undisputed. Well, why don't you state why they were not public employees, why they were not state actors? It's undisputed that at the event that they were working for MCOM, their employer, and performing duties in the course of their employment with MCOM, the allegation was that though they were employed as private security guards at the event, they were pretending and actually providing security services for the governor. And that is just nothing but an allegation and part of opening statements. There's no evidence to support that allegation. But suppose it's true that they pretended to be state actors. Does that make any difference? That's the distinction that was missed by the superior court in this case. The superior court kept analyzing the state actor issue from the perspective of whether their conduct could be attributed to the state. And this court's decision in Harvey makes clear that the question with respect to this type of situation isn't whether their conduct can be attributed to the state. I think there's probably no question of that. It's whether they can be treated as state actors for purposes of their own individual liability. And like the landlord in Harvey who was just called upon by the police officer to open a door acting under state compulsion, that conduct of the landlord may be attributed to the state but cannot be a basis for holding the landlord individually liable as a state actor. And that's exactly the scenario we have in this case. But maybe you're arguing that maybe if there was an agency issue for purposes of some kind of tort law, maybe that would be satisfied by a parent authority. But that tort concept of a parent authority does not apply here where the 14th Amendment requires an actual person closed in the state with some nexus not acting pursuant to an order of state. Right, because in many of the cases, even some of the cases that the Superior Court cited, are looking at it from the other angle, whether the individual conduct can be attributed back to the state, not whether the individual himself or herself can be held liable. And in this case and in the Harvey case, the individual is just being used as a tool in effect by the government as opposed to the individual using the government as its tool for its own purposes. And in this case, there's absolutely no evidence that either Elske or Benta had any personal motivation, any self-interest, any reason to do this, to take action in this case, but for the fact that they were ordered by Ludwig Thomas to take action to control this disturbance. Was there any evidence that they had some trappings of government employment? They previously worked – Benta previously worked for the governor. By the time of this event, he was undisputedly employed, no longer worked for the governor. Plaintiff's own witnesses testified he no longer worked for the governor. So they were working as private security guards? Yes. I mean, they weren't wearing badges of any sort? No, they were – Uniforms of any kind? They were in suits, plainclothes. Civilian clothing? Right. I have one issue that seems to me. He wasn't really prevented from speaking. This is not a restriction of one's message, assuming even that this is a forum where there'd be a right to deliver a well-run or a pertinent message. He certainly couldn't speak when he wanted to speak, which is not really a First Amendment issue unless the reason for ordering the person to speak at a later time is based on the content of the person's message. And is there anything here to suggest that the action, even if it's a civilian state, was based upon the content of his message? No, Your Honor. Again, these two defendants were on site reacting to a situation. All the evidence, all the plaintiff's evidence, all the evidence indicates there was confusion as to when he was supposed to speak. When the senator stated in his testimony when he thought he was supposed to speak conflicts with his own witness' statements as to when he was supposed to speak. So he approaches the bandstand where all the other speakers were already assembled on stage, and he chose himself to remain on the ground level, to be called up, to be summoned up to speak. And he wasn't summoned. He approaches the bandstand because he's confused as to when he's supposed to speak. And it's not clear even who, from the record, who was at the microphone at that moment, whether it was the emcee or the person introducing the keynote speaker. But in any event, there was somebody speaking at the microphone. He approaches the first set of stairs, and he is stopped because he's calling up, I want to speak. He's signaled by Gerard Emanuel, who was introducing the keynote speaker, hold on just a second. And he presses forward. He's turned away. At that point, his First Amendment rights aren't denied. He's told by police officers on the ground who are not part of the plot, not part of this elaborate scheme supposedly launched by the governor to interfere with his First Amendment rights. These are plainclothes and, I guess, clothed police officers. I was hoping they weren't. I know. Uniforms. The alarm went off that day. You said we had a nude capsule. Uniforms. So he is stopped. He's stopped. And they say to him, please wait here. We'll straighten it out. Was the problem the timing of his speaking or was the problem that he simply was not on the agenda or that he was prohibited from speaking entirely? He wasn't prohibited. He was first invited formally by the commission. At the event, his name did not appear on the program. He went to, by his own testimony and by all accounts, went to the governor. And by all accounts, the governor agreed to give him a slot in the roster. The confusion is where that was. The governor, the senator, the governor's press secretary, the master of ceremonies, all had different versions of where they thought or where they recalled he was to speak. So there was confusion as he approached the bandstand as to when he was supposed to speak. So the state actor issue aside, he was not restricted from speaking. It was just a matter of when he was scheduled to speak? Right. There's no question that the interference with his right isn't that he was denied a spot on the program. He was going to have a spot on the program. There was a question as to where. The interference with his right allegation is that they physically prevented him, Bento and Elsko, physically prevented him from exercising his First Amendment rights. But what happened was, after he approached the first set of stairs and was turned down, he encountered police officers who said, wait, let's straighten it out. And I think what is especially significant is what happens next. Instead of waiting to have it straightened out, the senator goes to the second set of stairs. And at the second set of stairs, he's encountered by another police officer, Officer Williams, who is not part of this alleged plot. She's just a police officer. And she stops him. And they actually get engaged in a physical altercation. And it's at that point – Physical? And actually that pushing, shoving, whatever was actually not deserving? They actually got locked arm to arm, and that's undisputed. And it's at that point that the program shut down, and that's when his rights were denied. Well, that's when he was not allowed to speak. The jury, in fact, found that his First Amendment rights were violated. There's no rational basis in the evidence for that. But there was a specific – I assume there was a separate jury question. Were his rights violated? And a separate question about whether the violators were state actors. I don't recall. Honestly, I don't recall. I believe they were instructed on each individual element. But I don't believe they had a separate question for state action versus First Amendment violation. Is the thrust of your appeal that the actors were not state actors? That they were not state actors. There's no evidence to support – in fact, the evidence shows to the contrary, that they were acting at the compulsion of the Governor or Ludric Thomas and had absolutely no self-interest in this. And their employment was entirely private? Yes. And that they were like the landlord in Harvey. And that that alone is the basis to grant judgment on the First Amendment claim. And even if they were state actors, there's no evidence that they did not act reasonably in controlling a disturbance or that they had any viewpoint-based motivation for doing so. Thank you. Ms. McIntosh, I know that – I'd call on you to respond to Ms. Corker, in which case I will ask her if she does want rebuttal. So when you're thinking of a written response, or you can submit a written response as an argument today, or you can just go back to where you were before and just say you're not going to respond. Whatever your pleasure is. With the approval of the Court, I will respond and also ask the Court for permission to submit a written response. Well, you can't do both. Okay. Well, then I'll do a verbal response, Your Honor. I thank the Court. May it please the Court, Maxwell McIntosh on behalf of the Pele. Your Honor, in this matter, while the matters have revolved around a First Amendment violation, I would ask the Court to look at the jury verdict form that was submitted to the jury. It was not merely on a First Amendment violation, but actually a defamation of character violation because of the actions of Mr. Benta and Mr. Elsko. What was submitted to the jury included the issue of the embarrassment that they had caused to Mr. Bryan. Was there a separate verdict for defamation of character? It was included all under the First Amendment, Your Honor. It was all mixed into one question to the jury? We can't tell whether they found a violation of the First Amendment and separately whether it was a defamation case? That is correct, Your Honor. What a mess. Thank you for the verdict sheet. The additional issue is, in this matter, the appellate division of the district court did not rule on the merits of the case. As appellant counsel indicated, there had been an oversight with reference to previous appellant counsel. Under Rule 50. That is correct, Your Honor. Is it clear that there was a request made in the course of the trial under Rule 50 and somehow that got left out of the record? But it's clear that Mr. Carroll renewed his motion. He said, I renewed my motion. It's on the record. Please consider it. That is correct, Your Honor. Magistrate Judge Cannon, who is now a magistrate judge in this court, was trial counsel for appellant. And it is clear. What is not clear, and not that it's not clear, as appellant counsel indicated, they subsequently had to seek addition to the record and obtain the transcript. The appellate division did not have that portion of the trial transcript, which indicated that, indeed, Mr. Cannon made a post-verdict Rule 50 motion. Isn't that correct? That is correct, Your Honor. And that portion of the record, which we now do have, which the district court appellate division did not have, makes clear he made such a motion, right? That is correct. But the issue there is the court did not fully go to the merits of the arguments as a result. So while in a footnote it's indicated in the court's order that they found that the evidence might not have been sufficient, the court never dealt with that issue because of the failure to submit that portion of the transcript. What is the remedy, then? I'm sorry, Your Honor? What's the remedy? Would you remand it? Or since we have the material in front of us, accept the motion, grant the motion to include it, and rule ourselves it's purely a legal question? It is a legal question, but, Your Honor, it would suggest that the matter be remanded to the district court as the entity to deal with it. The only issue for the district court is whether the Rule 50 motion was made. Reading from the record, Mr. Cannon said, Your Honor, at this point, we'd like to renew our Rule 50 motion with regards especially to the First Amendment argument that we've already put on record. We would just ask the court to consider that in light of the jury's verdict. That's crystal clear. When we look at the record and we try to find out what evidence is there here of state action, there may be a murky issue around whether or not this was an appropriate form. It's conceived that this is a form where the issue would even be raised. Given that form, then there's an issue of state action. I think there's an issue, it seems to me, of the, as I mentioned with Ms. Kocher, whether or not any action taken against the plaintiff is based upon the content of his message. I can't see anything at all. I'm not even sure you're arguing that. It wasn't the content of his message. It seems to me you're arguing that he was prevented from speaking, period. That's not a First Amendment issue, is it? On the First Amendment issue, and there is the testimony of Mr. Andrews. Even if he was prevented from speaking, it has nothing to do with his message? But in this case, there is evidence from Mr. Andre Hector, who was at one point a co-defendant in the matter and who testified at trial with reference to that Senator Adelbert Bryan was being prevented to speak because of the content of his message, and that it actually had been, and the court review and the transcript of Mr. Hector's testimony will see that there had been collusion between Hector, Benta, and Elskoe as well as government officials, and their intention was to prevent Senator Bryan from speaking at this event because of the content of his message. If we accept that, I mean, hypothetically, we haven't discussed it, but let's say we accept that point, you still have to show that they were state actors, right? Correct. In order to sustain the verdict against the two defendants. On the First Amendment issue. But in this case, as I indicated to the court, what was submitted to the jury was not only on a First Amendment, but actually a defamation of character claim. There was one question to the jury. Correct. And who submitted that question to the jury that day? Was that your request? That's how the jury verdict form was prepared. I understand that. It was the way it was done, but who made the request that these two seemingly inconsistent claims be submitted to the jury in one question? That's the manner in which the judge decided. And I honestly, Your Honor, don't remember if it had been a jury verdict form prepared by plaintiff or if it was submitted by defendant in the matter. The question was something like, did the defendants violate the plaintiff's First Amendment constitutional rights and did they also defame the defendant? Something like that? Correct. And the judgment that was issued by the court merely lists First Amendment in the actual judgment. But the jury verdict form, and as submitted to the jury, dealt with the issue of defamation because a major part of the case was with reference to the publicity that resulted as a result of the actions of the defendants in this matter and that there had been significant press coverage as well as television and radio coverage of this incident. It was indeed, as appellant counsel indicated, a very large event in 1998 celebrating the 150th emancipation of slavery. And as a result, there were a large number of people present as well as significant media coverage of what happened. We don't have your brief, sir, making a claim that the state actor issue is not dispositive of this case. I apologize, Your Honor. You didn't submit a brief. I mean, this is the first time that this issue was presented to us. Your argument today that you really can't decide this First Amendment issue because the First Amendment and the other claim were part of the same question to the jury so it would not be dispositive? That is correct, Your Honor. And so while appellant rests their arguments upon the First Amendment and all that they have argued is on the First Amendment, that's not the only issue that had been submitted to the jury. Looking at the jury verdict form in this matter would show to the court that beyond the First Amendment, this additional issue was submitted and all entangled together for the jury's consideration and so that when the jury returned the verdict, the jury's verdict included not only First Amendment but actual defamation. All right, but if we consider that the defendants were not, if we were to conclude that they were not state actors, at least minimally, you would agree that the First Amendment issue, that you would lose on the First Amendment issue? If they were not state actors or acting in concert with certain state actors. In this matter, there's evidence that these individuals were actually the ones who acted as if they were indeed in charge of the governor's security at the event. But weren't they obeying an order? Didn't the chief of security order them to prevent compliance from day nine of the time he was trying to go into state? That's what Mr. Ludric Thomas testified to as well as the defendants in this matter. However, the testimony of Andre Hector indicated that, and if the court would read the testimony, there's contrary evidence of that of where Mr. Hector indicated that there had been a meeting of the individuals prior to the event, that Mr. Banta had directed the individuals that Senator Bryan would be attempting to get on the stage and that it was their position to stop him from entering onto the stage. The designated public forum and the evidence of it is with reference to the event that was being held was one in which a number of dignitaries from around the world had been invited and were present. There was a large gathering of individuals for this 150th Emancipation. To be held at, and as Frederick said, it was called a bandstand, an area in which speeches, performances, and other things were given to members of the public. Could you go back a moment and tell me what the evidence was supporting the claim of defamation? The evidence with reference to the defamation included, and in the trial of the matter, the public recordings of the event was presented to the jury. There was a public television station in which the event was shown and broadcast, as well as newspaper articles indicating that Senator Bryan was responsible for ending the ceremony and disrupting the event. How was the Senator defamed? You haven't told me what was said explicitly that constituted defamation. What was said is, number one, that he had gotten into a fight with individuals, that he had... That was done at the scene of this political speech or this public event? The actions of the appellants in this matter caused that information to be spread throughout the Virgin Isles community, as Senator Bryan being the individual who caused, because the event had not concluded when the incident started. You mean the defendants themselves began to make statements that they were involved in a fight with Senator Bryan? What did the defendants do? There has to be publication for defamation to take place, whether it's slander or libel. How did some publication occur here? Were all of them written? The publication occurred from the defendants by their action and what was stated afterwards regarding the event. You're not answering the question. You're just saying it happened and therefore it was defamation. What explicitly did they do? What was published, when was it published, and what was the name of the publication? The Sinclair Avis article was presented to the jury regarding... That was the newspaper. Did the defendants do anything? That sounds like public reporting. There was public reporting of the event, sir. Is that the defamation? The defamation included the statements of the defendants. What were the statements? The statement was that Senator Bryan had attempted to get on the stage when he did not have any right to be up on the stage. How is that defamatory? I assume that the restatement of torts would embody for purposes of Virgin Islands law the elements of a defamation claim. Is that correct? That's correct, Your Honor. All right. So in what way are such statements defamatory and in what way would they have damaged Senator Bryan? Because nothing that you have related so far could be a per se defamatory statement, either liable or slanderous. So it must qualify in some other way as defamatory. Your Honor, the defamation as presented by the court to the jury dealt with reference to the... and anguish. And this was all balled into that jury verdict form that was submitted. Those are damages that might be actionable even in an intentional inflection of emotional distress claim. But there has to be a statement. The statement has to be somehow defamatory, which if it's not per se, it has to have damaged the plaintiff. And there must be publication. Not that it has to be printed, but there must be publication to some third party by the actors, by the tort users. Correct. And, Your Honor, what was presented to the jury in this matter showed the statements of Benta and Elsko with reference to the fact that Senator Bryan, the claim that Senator Bryan had been responsible for disrupting and ending the emancipation ceremony. That's the statement. The statement is he told someone that Senator Bryan had been responsible for disrupting and ending the ceremony. Who was the someone they told? This was broadcast on the radio as well as television.  of what the defendants had indicated and stated that Senator Bryan had done, or their claim as to what he had done. So within the trial transcript itself, there's evidence of the defendant's statement regarding Senator Bryan and what had been reported by the newspaper as to implicated to the defendants. It sounds like the news media was asking them questions and they were reporting back to the news media from their perspective what occurred. Why isn't that what happened? And why would that be defamation? The actions of the defendants in this matter and what they had done to Senator Bryan in pushing and restraining and stopping him from coming onto the stage in a very concerted effort and had actually been planned in advance as testified to by Andre Hector in causing this very public embarrassment of an individual was all included within the questions submitted to the jury. Thank you. Ms. Posta, do you want to reconsider what you said? This is starting to sound like this was the modern-day equivalent of Mark Anthey's human... Your Honors, this case, the judgment is on First Amendment. It doesn't reference defamation. The case was submitted, based on my recollection of the record, on First Amendment. To the extent there were allegations of humiliation... You said it was submitted. Are you talking about the jury inspection? Yes. Yes. The judge did not charge on defamation? It's my recollection that the court did not, that it was submitted on First Amendment, that the verdict, more important, the verdict is on First Amendment.  I would like an opportunity to go back and read the record and have a written response to this new argument that's been raised for the first time. Can't we just get a verdict sheet? I mean, is that part of the record? The verdict sheet is in the record. What? You have it? But, again, I don't have it here with me, but, again, I recall that it's just First Amendment check. I don't recall special interrogatories on each claim, and I don't recall... There weren't special interrogatories. It seemed like it was all melded into one question. And I believe the one question was First Amendment, and all the presentation, the closing arguments of plaintiff's counsel was all on the deprivation of the senators. It certainly would help, because this idea of defamation being part of that same question for the jury pretty much throws a wrench into your argument, because your argument is based solely on First Amendment, on a First Amendment claim, and that the actors which may have violated the First Amendment were not state actors. The judgment, the judgment that's almost $300,000 judgment against each defendant is based on First Amendment violation, and that's without question in the record. The judgment we are appealing from is from the hundred-some thousand each against them on the First Amendment violation. There's no judgment entered on defamation, and this isn't a defamation case. This is never... Well, they didn't participate in the district court and haven't participated in this appeal. This is a completely new issue. I'd like an opportunity to file a written brief to see if this was submitted on defamation and if the verdict can in any way be interpreted as including a defamation claim. Take a look at it and put it in the letter thanks to the record that would substantiate as to where what you just told us, and that without getting into the formalities of a written brief. Just do a 20-day audit, and that'll let us know where you'd like it to go to try to get a handle on this. And as far as the other arguments, this is a non-public forum that was decided by the Superior Court based on the fact that this was an orchestrated, carefully orchestrated program with invited speakers. It wasn't an open mic situation. The speakers were chosen as, you know, from the commission organized to prepare this whole event on this special day. It wasn't open to other classes of speakers. It was invited speakers only. And in that case, the government has the right to reasonably control access of the speakers as long as it's viewpoint neutral. And the control of the disturbance of an event is a legitimate basis under First Amendment jurisprudence to control access or deny access based on... in a non-public forum. I would agree with that. I mean, not everybody can step up to the mic and start presenting a speech. There is some order in the process. But he was invited to speak, wasn't he? He was invited to speak. He was invited formally by written notice to speak. Then it appeared that he wasn't on the program. That was corrected informally between the governor and the press secretary and the master of ceremonies. But again, there was some confusion. The whole problem, I think, started in this case because there was confusion over when he was to speak. And it looks like there was some back and forth between the governor and him. He had a preference. He had a strong preference as to where he would speak. The governor wasn't quite willing to do that, and they reached a compromise. That's what it looks like in the testimony. But it's not clear that anybody understood where that spot was. And as far as Andre Hector's testimony, he did not... To the extent Andre Hector testified about any relationship between the defendants and the governor or Ludwig Thomas, it was just in the context of preventing Benta from... Brian from disturbing the performance or the program. Thank you. There's no evidence whatsoever that Benta or Brian had any involvement whatsoever in this whole supposed elaborate plot that the governor had to invite him, disinvite him, re-invite him, create confusion as to where he's going to speak. All they did was stop a disturbance as it developed on the stage. And also, there is absolutely no evidence on the record in any form, including Hector's testimony, that they acted based on the content of the senator's speech because nobody knew what he was going to say. He didn't submit a written speech. He hadn't been given any particular topic to speak on. Nobody knew what he was going to speak about, except that he was... And so nobody knew what the content of his speech was going to be. And to the extent there was any allegation there was some political motivation, Benta and Brian are from his same political party. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.